1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**

For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTINE KUEHBECK, on behalf of
herself and all others similarly situated,

        Plaintiff,

  v.

GENESIS MICROCHIP INC., AMNON
FISHER, ERIC ERDMAN, and ANDERS
FRISK,

        Defendants.

_____/

No. C 02-05344 JSW

**ORDER GRANTING
DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED
COMPLAINT**

**INTRODUCTION**

On November 7, 2002, Plaintiff, Christine Kuehbeck ("Ms. Kuehbeck") filed her initial complaint in this action. On July 3, 2003, she filed her first amended class action complaint ("FAC"). The Court dismissed the FAC with leave to amend on March 29, 2004. (Docket No. 43 (hereinafter the "March 29 Order".)[1]  Pursuant to that Order, on May 27, 2004, Ms. Kuehbeck filed her Second Amended Class Action Complaint ("SAC").

Now before the Court is the motion to dismiss the SAC filed by defendants Genesis Microchip Inc. ("Genesis"), Amnon Fisher ("Mr. Fisher"), Eric Erdman ("Mr. Erdman"), and Anders Frisk ("Mr. Frisk") (collectively "Defendants"). Defendants bring this motion on the grounds that the SAC does not meet the heightened pleading requirements of the Private

---

[1]  The March 29 Order is attached as Exhibit L to the Declaration of Natalie Bridgeman ("Bridgeman Decl.") filed in support of Defendants' current motion.

Securities Litigation Reform Act ("PSLRA") and fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

Having carefully reviewed the parties' papers, relevant legal authority, and having had the benefit of oral argument, the Court GRANTS Defendants' motion to dismiss without leave to amend.

## FACTUAL BACKGROUND

Ms. Kuehbeck brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5, on behalf of herself and all other persons or entities who purchased Genesis common stock on the open market during the period between April 29, 2002 and June 14, 2002 ("the Class Period").[2]  Ms. Kuehbeck alleges that Genesis, and Messrs. Fisher, Erdman, and Frisk made false and misleading statements concerning Genesis pro forma net income for fourth quarter fiscal year 2002 ("Q4 2002"), concerning Genesis' projected revenues for the first quarter of fiscal year 2003 ("Q1 2003"), and concerning market demand for Genesis' integrated circuits ("ICs").[3]

### A.    Genesis and Its Business.

Genesis is in the business of supplying ICs used in flat screen LCD monitors for computers and other devices.  Genesis' customers are end users of ICs who combine Genesis' ICs with flat screen panels and other products to manufacture flat screen monitors.  (SAC, ¶¶ 22-23.)  Genesis designs its ICs but relies on manufacturers in the Far East to manufacture them. (*Id.,* ¶ 40.)  It allegedly takes Genesis twelve to fourteen weeks to take delivery of products from its manufacturers once an order is placed.  (*Id.*)  Genesis conducts much of its business with a limited number of customers or vendors, and its sales are heavily concentrated among approximately twelve manufacturers of flat screen monitors.  (*Id.*, ¶ 41.)

---

[2]     The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

[3]     Ms. Kuehbeck's allegations as to these latter statements overlap with her challenge to the projected revenues because she contends the same "true" facts render these statements and projections false and misleading.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  On February 20, 2002, Genesis announced it had completed a merger with Sage, Inc., a

2  "leading provider of digital display processors." (*Id.*, ¶ 69.)[4]

3  The individual defendants were all high-ranking employees of Genesis during the Class

4  Period. (*Id.*, ¶¶ 24-28.) At all relevant times, Mr. Fisher was Chief Executive Officer and a

5  member of the Genesis Board of Directors, Mr. Erdman was Chief Financial Officer, and Mr.

6  Frisk was Vice President of Marketing. (*Id.*)

7  **B.**   **Alleged False Statements in April 29, 2002 Press Release and Conference Call.**

8

9  Ms. Kuehbeck's claims revolve around statements made in a press release dated April

10  29, 2002, and on a conference call held that same day. In the press release, Genesis announced

11  its Q4 2002 financial results and addressed its financial forecasts for Q1 2003. For Q4 2002,

12  Genesis reported pro forma net income of $8.9 million. (SAC, ¶ 132; RJN, Ex. A.) Ms.

13  Kuehbeck claims this statement was false because Genesis included standard operating expenses

14  in charges related to the Sage merger. (SAC, ¶¶ 133-39.) Defendants estimated that Genesis'

15  Q1 2003 revenue would exceed $60 million. (SAC ¶ 154; RJN, Ex. A.)

16  In the conference call, Defendants made a number of statements about Genesis' overall

17  well being with respect to its market share, demand for its products, and an alleged glut in

18  customer inventory of Genesis ICs. For example, Mr. Frisk stated with respect to "the current

19  environment of tight panel supply" that "the leading brand name monitor and PC vendors have

20  been the first to receive panels, and since they make up the majority of our volume, we are not

21  seeing any shrinkage in volumes due to panel supply constraints." (SAC, ¶¶ 146-47.) Mr.

22  Erdman stated that Genesis anticipated that its "revenues will mirror the growth of [the flat

23  panel] market." (*Id.*, ¶ 149.) Mr. Erdman also stated that "in the foreseeable future we don't see

24  any substantial change in our market share."[5] (*Id.*, ¶ 152.) In reference to demand for Genesis

25  products, Mr. Frisk stated that Genesis' "existing tier one customers are continuously updating

26  ───────────────

27      [4]      Most of the facts relating to the Sage merger are irrelevant to Ms. Kuehbeck's claims.

28      [5]      Defendants repeated this assertion in several ways during the conference call. (*See* SAC, ¶ 152).

3

their products and switching their designs to our new parts ... ." (*Id.*, ¶ 151). Defendants also made other statements regarding Genesis' advantages over its competitors. (*See id.*, ¶ 152.)

Ms. Kuehbeck contends that each of these various statements were false and misleading because, at the time they were made, Defendants knew of the inventory glut, that Genesis was having technical problems with its ICs and was having trouble meeting its customers demands, and that Genesis was facing increased competition in the marketplace. As a result of all of these issues, Ms. Kuehbeck contends that Defendants knew Genesis did not have enough orders booked or design wins logged to meet revenue projections. (*See, e.g.,* SAC, ¶ 158.)

Analysts responded well to Defendants' April 29 statements, which encouraged investors to purchase Genesis stock. Following the April 29 statements, Genesis' stock price increased from $20.275 to $24.01 per share and continued to rise in May to close at a high of $28.40 on May 16, 2002. (SAC, ¶¶ 156-57.) However, in a press release dated June 14, 2002, and on a conference call held on that day, Genesis reduced its first quarter fiscal 2003 revenue estimates and acknowledged that the lower revenue expectation was caused by customer inventory build up and a decline in orders. (*Id.*, ¶ 177, 179, 181, 183, 185-86.) Following these statements, Genesis' stock price dropped from $12.24 to close at $9.02. (*Id.*, ¶¶ 176-77, 187.)

**ANALYSIS**

Section 10(b) of the Securities and Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

> (a)    To employ any device, scheme, or artifice to defraud;
> (b)    To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c)    To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, and (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005) (plaintiff must allege facts regarding proximate cause and economic loss). As in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. Fed. R. Civ. P. 9(b); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999).

Section 20(a) of the Securities and Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

### A.    Pleading Standards Under the Private Securities Litigation Reform Act.

Under the PSLRA, a "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). As the Ninth Circuit has stated, "[t]he fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (emphasis in original). Thus, a plaintiff can explain why a statement is false by pointing "to contemporaneous, inconsistent statements by defendants or show that information available to defendants showed different results than defendants predicted." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1240 (N.D. Cal. 1998) (citing *GlenFed,* 42 F.3d at 1549).

The PSLRA further requires that a plaintiff "state with particularity facts giving rise to a strong inference that a defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *In re Vantive Corp. Sec. Litig.,* 283 F.3d

United States District Court

For the Northern District of California

1079, 1085 (9th Cir. 2002).  For forward looking statements, the PSLRA requires that a

challenged statement be "made with actual knowledge by that person that the statement was

false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i). To assess whether a plaintiff has pled

scienter sufficiently, a court "must consider 'whether the total of plaintiffs' allegations, even

though individually lacking, are sufficient to create a strong inference that the defendants acted

with deliberate or conscious recklessness." *Nursing Home Pension Fund v. Oracle Corp.*, 380

F.3d 1226, 1230 (9th Cir. 2004) (citation omitted) (hereinafter "*Oracle*").  In order to conclude

whether, on balance, a complaint gives rise to the requisite inference of scienter, a court must

consider all factual allegations and all reasonable inferences therefrom, including inferences that

may in fact be unfavorable to a plaintiff. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.

2002).

This Court must accept Ms. Kuehbeck's allegations as true and construe them in the

light most favorable to her. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *In re Silicon

Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999).  "Conclusory allegations of law

and unwarranted inferences, however, are insufficient to defeat a motion to dismiss."  *In re

Northpoint Communications Group, Inc. Sec. Litig.*, 221 F. Supp. 2d 1090, 1094 (N.D. Cal.

2002) ("*Northpoint II*").  Where the pleadings are not sufficiently particularized or where, even

taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule

12(b)(6) is proper.  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

**1.      Request for Judicial Notice.**

In ruling on a motion to dismiss, the Court may consider the facts alleged in the

complaint, documents attached to the complaint, documents relied upon but not attached to the

complaint when the authenticity of those documents is not questioned, and other matters of

which the Court can take judicial notice. *In re Silicon Graphics*, 183 F.3d at 986; *Northpoint II*,

221 F. Supp. 2d at 1094.

United States District Court

For the Northern District of California

1    Defendants seek judicial notice of press releases, SEC filings, conference call

2    transcripts, some of the e-mail messages referenced in the SAC, and the March 29 Order.[6]  Ms.

3    Kuehbeck does not object to Defendants' request, except to the extent she believes Defendants

4    are disputing facts set forth in the e-mail messages.  Because the Court may take judicial notice

5    of these documents, Defendants' request is GRANTED IN PART.[7]  *See, e.g., In re Calpine Sec.*

6    *Lit.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial notice of

7    SEC filings and documents expressly referenced" in a complaint).  The Court has evaluated

8    these materials in accordance with the procedural posture of this case and the applicable legal

9    standards.

10                    **2.    Confidential Source Witness Allegations.**

11    Ms. Kuehbeck bases many of her allegations on information provided by confidential

12    source witnesses identified as Employees A-F.  Ms. Kuehbeck must, therefore, plead all facts

13    about these witnesses that are material to her belief that the information provided by these

14    witnesses is accurate.  *See In re Secure Computing Corporation Sec. Litig.*, 120 F. Supp. 2d

15    810, 817 (N.D. Cal. 2000).  The precise level of detail needed to support confidential source

16    witness allegations depends upon the circumstances of a particular case.  *Id.*  For example,

17    although a particular source need not be named, the complaint must provide sufficient detail "to

18    support the probability that a person in the position occupied by the source would possess the

19    information alleged."  *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1178 (S.D. Cal. 2004).  With

20    regard to the scienter requirement, "allegations attributed to unnamed sources must be

21    accompanied by enough particularized detail to support a reasonable conviction in the

22    informant's basis of knowledge."  *Northpoint II*, 221 F. Supp. 2d at 1097.

23    The Court concludes that if it were to rely solely on the facts alleged in the SAC, it could

24    not find Ms. Kuehbeck's confidential source allegations sufficient to support her claims.  Ms.

25    _____

26    [6]    These documents are attached as exhibits to the Bridgeman Declaration and
     are cited herein as "RJN, Ex. ___."

27

28    [7]    Defendants also ask the Court to take judicial notice of House Conference
     Report No. 104,369, which was not necessary to the resolution of this motion.  Accordingly,
     that request is DENIED.

Kuehbeck only alleges minimal facts about each source's title, general job responsibilities, and overall basis for knowledge. *See Osher*, 308 F. Supp. 2d at 1178 ("A complaint should at least include each witness's job title and describe their responsibilities within the Company.") However, in opposing Defendants' motion, Ms. Kuehbeck provided supplemental facts about Employees A-F. *See* Declaration of Frank Driscoll ("Driscoll Decl."), Declaration of Robert Finkel ("Finkel Decl.").[8]  Defendants attack the sufficiency of the allegations in the Driscoll and Finkel declarations and bring to the Court's attention a variety of inconsistencies between the facts set forth in the declarations and in the SAC.  The Court has considered any inconsistencies between facts alleged in the SAC and those set forth in the Driscoll and Finkel declarations in evaluating Ms. Kuehbeck's claims.

Ms. Kuehbeck relies on Employee B, a "business system engineer" who worked primarily on integrating Genesis and Sage business operations.  Employee B claims that Peter Mangan, Genesis' former CFO, made a presentation in or about late February 2002, which showed that Genesis was in a more dire financial situation than was represented in the April 29 press release and conference call.[9]  Ms. Kuehbeck has not alleged that Employee B was at this meeting or that Mr. Mangan advised him of these facts.  The only basis alleged for his knowledge is that Employee B reported directly to Mr. Mangan and that Employee B's name is on Genesis emails.  (*See* SAC, ¶ 86; Driscoll Decl., ¶ 13.)   The Court finds these facts insufficient to establish that Employee B was in a position to know facts about this presentation that are attributed to him.

---

[8]     At the hearing, Defendants stated they had no objection to the Court considering the supplemental facts.  Because those facts are not matters of which the Court could take judicial notice, the Court has considered these facts and any inconsistencies between the allegations in the SAC and the Driscoll and Finkel declarations to determine whether leave to amend should be granted.  The Court concludes that the supplemental allegations would not save Ms. Kuehbeck's claims and that further amendment would be futile.

[9]     If Mr. Mangan in fact made this presentation, there is an inconsistency about whether he made it to the Board or to senior executives.  (*Compare* SAC, ¶¶ 86-87 *with* Driscoll Decl., ¶ 13.)  Although Ms. Kuehbeck apparently has spoken with Mr. Mangan, she does not claim that he told her about this presentation.  (*See* SAC, ¶ 88.)

United States District Court

For the Northern District of California

Ms. Kuehbeck also relies on Employee D as a source of information about Mr. Mangan's presentation.  (*See* SAC, ¶¶ 86-87; Driscoll Decl., ¶ 20.)  There is a glaring inconsistency in the record about Employee D's position at Genesis.  In the SAC, Employee D is "a senior employee with responsibilities within the finance department."  It appears, however, that Employee D actually is "a manager of information technology functions."  (*Compare* SAC, ¶ 86 *with* Driscoll Decl., ¶ 18.)  Employee D is alleged to have had a "close working relationship" and "good rapport" with Genesis senior executives based on his close proximity to their offices.  (*Id.*, ¶¶19, 21.)  Ms. Kuehbeck does not allege that Employee D attended the meeting in question, that Mr. Mangan ever told Employee D that he had voiced these opinions to the Board, or that Employee D learned of Mr. Mangan's opinions because they were reflected in email messages that Employee D was ordered to destroy.[10]  The Court, therefore, concludes that the factual allegations are insufficient to rely on Employee D as a source about the presentation.

Ms. Kuehbeck also relies on Employee C, a quality assurance employee as a source for her allegations about Genesis' knowledge of the alleged inventory glut.  (*See* SAC, ¶ 118; Driscoll Decl., ¶ 14.)  She claims Employee C told her that Genesis' customers were not able to access sufficient flat screen panels.  (SAC, ¶ 118.)  Employee C is alleged to have worked on troubleshooting problems customers encountered with Genesis' ICs.  (Driscoll Decl., ¶ 15.)  Ms. Kuehbeck does not allege that Employee C ever spoke with customers.  The Court concludes that the facts in the SAC and the Driscoll declaration are insufficient to establish that Employee C would be in a position to have information about Genesis' customers problems accessing flat screen panels.

The Court also has ignored facts attributed to Employee E, a Genesis field application engineer ("FAE") manager, as support for the accounting fraud allegations.  (SAC, ¶ 102,

---

[10]     The Court addresses this and other facts attributed to Employee D more fully in its discussion of scienter.

9

**United States District Court**

For the Northern District of California

1  Driscoll Decl., ¶ 27.)[11]  Employee E claims the reported Q4 2002 pro forma net income was

2  "crap," and supports his opinion by claiming that increased engineering costs motivated Genesis

3  management to classify operating expenses as non-operating charges.  (SAC, ¶ 138; Driscoll

4  Decl., ¶ 29.)  Although the nature of his position suggests Employee E may have knowledge of

5  matters pertaining to Genesis' engineering costs as well as costs associated with problems in

6  that department, the Court concludes that Ms. Kuehbeck has not provided sufficient information

7  to show that Employee E would know how Genesis chose to report financial information,

8  including how it reported operating costs.  In contrast, Employee A, identified as Genesis'

9  Director of Statutory Reporting, whose responsibilities included "managing external financial

10  reporting and Genesis' relationship with its outside auditor, accounting research, and assisting in

11  the preparation of Genesis' tax returns," is silent on the alleged accounting improprieties.  (*See*

12  Driscoll Decl., ¶¶ 9-12.)  The Court finds that silence telling.  *See In re U.S. Aggregates, Inc.*

13  *Sec. Litig.*, 235 F. Supp. 2d 1063, 1074-75 (N.D. Cal. 2002) (holding that plaintiffs had not

14  alleged accounting fraud with sufficient particularity where, *inter alia*, "none of the confidential

15  witnesses have any first-hand knowledge of [defendant's] accounting decisions").

16       Ms. Kuehbeck also relies on information given to her by Employee F, a "former senior

17  officer from Sage who left Genesis shortly after the merger."  (*See* SAC, ¶ 100; Finkel Decl., ¶

18  2.)  Employee F reportedly told Ms. Kuehbeck that Genesis was consistently losing design wins

19  prior to the Class Period and that Genesis was instituting patent litigation against its competitors

20  to forestall loss of market share.  (Finkel Decl., ¶ 5.)  Ms. Kuehbeck asserts the information

21  received from Employee F corroborated other unspecified documents and information she

22  received about Genesis' loss of design wins, market share, and customer orders.  (*Id.*, ¶ 6.)  If

23  that "information" refers to the emails and information from other source witnesses referenced

24  in the SAC, for reasons stated in the remainder of this Order, the Court finds that such

25  information would not cure the defects in allegations attributed to Employee F.  Although, Ms.

26  Kuehbeck asserts that Employee F "clearly had personal knowledge to support [the] allegations"

27

28       [11]     The Driscoll Declaration contains two paragraphs identified as paragraph 27,
one that concludes the section about Employee E and one that commences the section about
Employee F.  The Court refers to the former paragraph as 27.

United States District Court

For the Northern District of California

referenced in paragraphs 100 and 115 of the SAC, the essence of that assertion is that Employee F knew these facts by reason of his position.  Without further details from Employee F, that is not a sufficient basis for the Court to conclude that Employee F would have the information he provided.  *Cf. In re Autodesk Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("plaintiffs must do more than allege that these key officers had the requisite knowledge by virtue of their 'hands-on' positions").

### B.      Pleading Falsity.

In order to properly plead falsity, Ms. Kuehbeck must identify the particular statements alleged to be false or misleading, the reasons why those statements are false and misleading, and the particular facts supporting her allegations.  In her SAC, Ms. Kuehbeck identifies with particularity the statements that she alleges to be misleading: the reported Q4 2002 pro forma net income, *see* SAC, ¶¶ 133-139; the revenue projection for Q1 2003, *see* SAC, ¶ 154-155; and twelve statements about market demand for Genesis products, which can be divided generally into statements about Genesis' ability to maintain its market share, the inventory glut, and statements comparing Genesis to its competitors, *see* SAC, ¶¶ 146, 149, 151-52.[12]

### 1.      Accounting Allegations

Ms. Kuehbeck contends that Genesis statement that its Q4 2002 pro forma net income totaled $8.9 million was false because Genesis included recurring operating expenses as one time only charges related to the Sage merger, *i.e.* Genesis improperly inflated its operating income by "including in merger-related charges standard costs of operating Genesis' business." (SAC ¶¶ 74-75, 130-39.)  "To plead a claim for accounting fraud, plaintiffs must plead facts

---

[12]      Ms. Kuehbeck clarified at the hearing that the underscored statements in these paragraphs are those portions of the statements alleged to be false or misleading.  Ms. Kuehbeck also contends that Mr. Fisher falsely stated that Genesis' Q4 2002 results "were primarily driven by strong demand sustaining our market shares in the flat panel monitor market."  (*See* SAC, ¶ 148.)  To the extent she claims the statement was false and misleading because of the alleged accounting fraud, the allegations are insufficient for the same reasons the accounting fraud allegations are insufficient.

To the extent Ms. Kuehbeck challenges the veracity of this statement on its face, the facts alleged do not give rise to an inference that Genesis' Q4 2002 results were *not* driven by strong demand for Genesis products.  Thus, the Court concludes that Ms. Kuehbeck fails to allege with sufficient particularity why this statement was false when made.

**United States District Court**

For the Northern District of California

1   sufficient to support a conclusion that defendants prepared the allegedly fraudulent financial

2   statements and that the alleged financial fraud was material, and must identify the particular

3   transactions underlying the alleged accounting deficiencies." *In re Pacific Gateway Exchange,*

4   *Inc. Sec. Litig.*, 169 F. Supp. 2d 1160, 1166 (N.D. Cal. 2001).  In general, this requires plaintiffs

5   to identify particular transactions, the dates on which such transactions occurred, or details

6   relating to particular entries in a defendant's financial reports that are alleged to be false.  *Id.*

7        The Court already has determined that it will not rely on facts attributed to Employee E

8   about this claim.  Thus, Ms. Kuehbeck's factual support for the accounting fraud claim is based

9   on a November 27, 2001 email from Matt Ready, Genesis' Vice President of Sales, which

10  directed an employee to "get a req[uisition] going for 801GF Video Pattern Generators and add

11  to it. ... I can get signed off so stuff is ordered 1/1/02 and is washed in with Sage deal closing ...

12  LOAD up all sites/offices."  (SAC ¶ 75.)  Ms. Kuehbeck, however, neither has alleged facts

13  from which it can be inferred that the employee complied with this request by ordering the

14  generators and that Mr. Ready then included them in charges related to the merger with Sage,

15  nor alleged facts identifying other standard costs, if any, that were included in the merger costs.

16  Similarly, she has not set forth facts showing the amounts of the transactions involved or the

17  amounts by which Genesis overstated its pro forma net income.  *See In re Vantive,* 283 F.3d at

18  1091 (upholding dismissal of plaintiffs' claims in part because of insufficient allegations on

19  amount by which revenue was overstated); *In re Pacific Gateway*, 169 F. Supp. 2d at 1160

20  (holding that plaintiffs' accounting fraud claims were deficient where plaintiffs did not identify

21  specific transactions, dollar amounts involved, or entries in reports that were alleged to be in

22  error).

23       Accordingly, the Court concludes that Ms. Kuehbeck has not met her burden to plead the

24  accounting fraud claim with the requisite particularity.

25

26

27

28

**United States District Court**

For the Northern District of California

**2.     Revenue Projection and Statements About Market Demand.**

Ms. Kuehbeck also challenges Defendants' statements addressing market demand for Genesis' products and its Q1 2003 revenue projections.[13]  In essence, Ms. Kuehbeck contends that Defendants painted a rosier picture with respect to Genesis' market position, its advantages over its competitors, and the status of product orders than existed.  To explain why she believes the challenged statements were false when made, Ms. Kuehbeck attempts to remedy pleading defects set forth in the March 29 Order by identifying contemporaneous facts gleaned from the emails and source witnesses that purportedly show Defendants knew or should have known of the true facts.  Nonetheless, the Court concludes she has not met her burden to plead with particularity the challenged statements were false when made.

For example, with respect to declining orders from customers and lost sales, Ms. Kuehbeck does not specify which customers were discontinuing products or what products were involved, with the exception of Phillips.  (*See* RJN Ex. O.)  As to Phillips, however, Ms. Kuehbeck provides no details about how much revenue Genesis derived from Phillips or the number of orders Phillips had placed in the past in comparison with other customers.  Even considering Genesis' apparently heavy reliance on approximately 12 customers, the SAC provides no additional details, before the June 14, 2002 conference call, demonstrating the financial impact of these lost sales.  Thus, the Court finds there are insufficient facts to show that contrary to the statements made on April 29, Genesis was seeing a change in its market share and facing increased competition that was reducing its bottom line prior to the start of the Class Period.  *See In re Secure Computing*, 120 F. Supp. 2d at 918 (finding plaintiffs had not alleged falsity with particularity where factual allegations were not inconsistent with later statements and did not raise an inference that defendant was in poor financial shape).

---

[13]     The April 29 press release specifically identifies the revenue projection as a forward looking statement, and Defendants started the April 29 conference call by stating that it contains forward looking statements. (*See* RJN, Exs. A, D.)  Those statements are followed by risk disclosures.  Because the Court concludes that Ms. Kuehbeck has not met her burden to plead falsity and scienter with particularity, the Court does not address the question of whether the risk disclosures also protect Defendants from liability.  For this same reason, the Court does not consider whether other statements identified by Ms. Kuehbeck are actually forward looking statements.

**United States District Court**

For the Northern District of California

1    The emails referenced in the SAC and attached to the Bridgeman Declaration do show

2    that some Genesis customers were not pleased with Genesis and that Genesis experienced some

3    problems with its ICs. Again, however, with the possible exception of Phillips[14], those emails

4    do not demonstrate that those customers acted upon their displeasure and cancelled orders or

5    declined to award design bids to Genesis. Nor has Ms. Kuehbeck identified any internal reports

6    that demonstrate such events occurred. Similarly, there are no facts alleged that would show

7    Genesis saw reduced orders because of constraints in panel supplies and the alleged inventory

8    glut. As such, the statements and facts set forth in the emails are not necessarily inconsistent

9    with Defendants' April 29 statements. *Compare Wenger*, 2 F. Supp. 2d at 1247 (noting that

10   "[a]ll business from time to time suffer management problems and product delays, but many

11   manage to 'do very well' despite these commonplace business wobbles" and concluding

12   plaintiff's nonspecific allegations about product delays were insufficient to state fraud with

13   particularity) *with In re PeopleSoft, Inc. Sec. Litig.*, 2000 U.S. Dist. Lexis 10953 (N.D. Cal. May

14   26, 2000) (finding allegations sufficient to state a claim where plaintiffs alleged facts showing

15   that specific customers had refused to pay for products with alleged defects and had threatened

16   suit against company over defects).

17   Ms. Kuehbeck also challenges particular statements regarding Genesis' advantage over

18   its competitors. A review of the factual allegations demonstrates that Ms. Kuehbeck does not

19   allege with particularity why such statements were false when made. By way of example, Ms.

20   Kuehbeck claims that Mr. Frisk's statement, "I estimate it will take the competition at least two

21   years to reach the level of integration, quality and reliability that we deliver today," was false

22   because Genesis' competitors were able to provide Genesis' customers with other IC options.

23   That statement, however, follows Mr. Frisk's statement about "[o]ther unique Genesis monitor

24   controller features" including "the energy spectrum management, which reduces the cost and

25   complexity to design a monitor that meets FCC emission standards." (RJN, Ex. D at 14.) Thus,

26   read in context, the challenged statement refers to the "unique Genesis monitor controller

27

28   _____
       [14]     There are no specific details alleged about the financial impact of Phillips'
       actions.

14

United States District Court

For the Northern District of California

1    features." The SAC does not contain particularized facts suggesting that competitors threatened

2    Genesis on this feature of its IC controllers. The Court concludes when the other statements

3    about Genesis' advantages over its customers are read in context, the facts alleged do not

4    suggest the statements were false when made.

5         Accordingly, Ms. Kuehbeck has not met her burden of pleading falsity.

6        **C.    Scienter.**

7         Even if Ms. Kuehbeck were to have met her burden with respect to pleading that the

8    challenged statements were false and misleading, the Court concludes that she has not met her

9    burden with respect to scienter. To meet that burden, Ms. Kuehbeck must demonstrate that

10    Defendants acted "intentionally or with deliberate recklessness." *In re Vantive Corp.,* 283 F.3d

11    at 1085. The Ninth Circuit has defined deliberate recklessness to mean "an extreme departure

12    from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers

13    that is either known to the defendant or is so obvious that the actor must have been aware of it."

14    *Silicon Graphics*, 183 F.3d at 976 (quoting *Hollinger v Titan Capital Corp.*, 914 F.2d 1548,

15    1569 (9th Cir. 1990) (en banc)). Ms. Kuehbeck's allegations regarding Genesis' projected

16    revenues, by their nature, are forward looking statements, and she must demonstrate that

17    Defendants actually knew the statements were false or misleading when they made them. *See*

18    15 U.S.C. §§ 78u-5(c)(1)(B)(i), 78u-5(i)(1).

19         Ms. Kuehbeck again asserts that because of the nature of Genesis' business and its small

20    number of customers, Defendants must have known what products those customers were

21    ordering and in what amounts. Ms. Kuehbeck has added to the allegations in her FAC by

22    pointing to the fact that, on February 27, 2002, Mr. Fisher stated that forecast information was

23    "based on information that I can get my hands on," and that "we don't want to provide numbers

24    based on information we guess." (RJN, Ex. C at 18; *see also id.* at 21 ("I know what we have

25    on our backlog, I know what the customers are, I know what they're going to order during the

26    rest of the quarter, and what they'll order in June.").) Ms. Kuehbeck attempts to equate Mr.

27    Fisher's admissions to the factual situation in *Oracle,* 380 F.3d 1226. In that case, the

28    defendants admitted they knew about deals in question. In addition, the plaintiffs identified an

United States District Court

For the Northern District of California

1  internal Oracle database containing specific information about the number of sales Oracle

2  achieved, as well as facts demonstrating that the individual defendants actually reviewed that

3  database.  *Id.* at 1231-32.  Those facts, in combination with highly suspicious stock sales, led the

4  Ninth Circuit to conclude that the plaintiffs demonstrated the defendants acted with the requisite

5  scienter.  *Id.* at 1234.

6          The Court finds the facts in this case distinguishable.  First, unlike in *Oracle*, Ms.

7  Kuehbeck has not identified specific internal reports that would have provided Defendants with

8  particularized and detailed information about Genesis' sales and whether they were declining, as

9  a result of the alleged problems.  Rather, Ms. Kuehbeck's factual support for these claims is the

10  emails cited in the SAC.  Although Messrs. Erdman, Fisher and Frisk are listed as recipients on

11  some of those emails, as discussed in Section B, the emails do not provide hard numbers or

12  specific information about the allegedly declining sales and their impact on Genesis' financial

13  situation.  Furthermore, some of the emails suggest that Genesis had other customers on which

14  it could rely to offset any potential decline in revenues.  (*See, e.g.,* RJN, Ex. O at 2).  The cited

15  emails also suggest that some of Genesis' problems were due to the rapid expansion of Genesis'

16  business that Genesis would face increased pressure to meet customer expectations.  Those facts

17  do not translate a conclusion that at the time Defendants made the challenged statements in

18  April, they were intentionally withholding information showing that they knew Genesis had lost

19  orders and design wins, or were deliberately reckless in doing so.  *See In re Silicon Graphics,*

20  183 F.3d at 985; *cf. Wenger*, 2 F. Supp. 2d at 1247.

21          Ms. Kuehbeck's reliance on confidential source allegations is also insufficient to meet

22  her burden to establish scienter.  With respect to the design problems discussed above,

23  Employee C, "a former Genesis senior quality assurance employee" responsible for quality

24  assurance testing of new products, claims Genesis was experiencing some technical problems

25  with its ICs, especially following the merger with Sage.  (SAC, ¶ 117; Driscoll Decl., ¶ 14.)

26  Employee C claims another FAE told him that 80-90 percent of the Sage chips were not good,

27  requiring Genesis' FAEs to rewrite corrections for them, and that he personally viewed defects

28  in the chips.  (Driscoll Decl., ¶¶ 15-16.)  Employee E also claims that Genesis designs had a lot

United States District Court

For the Northern District of California

1    of "bugs" in them, that it took Genesis 5-6 months to design IC's to its customer's satisfaction,

2    and that customers were pressuring Genesis to roll out new designs every six months.

3    Employee E also states that he participated in meetings with Mr. Frisk in which these problems

4    were discussed.  (*Id.*, ¶ 28; SAC, ¶¶ 103-04.)  Employee A claims that Genesis' customers had a

5    lot of inventory and that they were not going to purchase more products from Genesis.  (*See*

6    SAC, ¶¶ 86-87; Driscoll Decl., ¶¶ 9-11.)

7         Although Employee A may have been a position to know the status of Genesis' financial

8    information, it is not clear how he would have information about what Genesis' customers

9    would or would not do or what inventory they had in stock.  It would be reasonable for the

10   Court to infer that Employee A, who is alleged to have been involved with Genesis' financial

11   reporting, would have specific information about declining sales or orders prior to the Class

12   Period.  As with his silence on the accounting fraud claims, this silence is telling.  *See Gompper*,

13   298 F.3d at 897 (court may consider inferences that may in fact be unfavorable to a plaintiff

14   when evaluating scienter).  Further, the allegations attributed to Employees C, E and A about

15   design problems and inventory do not include allegations about specific lost sales, lost design

16   wins, or lost orders.  Nor do these allegations show that each individual defendant knew of these

17   problems.  *See, e.g., Northpoint II*, 221 F. Supp. 2d at 1104-05 (evaluating allegations of

18   scienter with respect to each individual defendant).

19        Employee C also was reportedly told by Mohammed Tafazzoli, Genesis' Vice President

20   of Operations, that Genesis officers had "lied" on the April 29, 2002 conference call with

21   respect to the projected revenues and that Genesis would only make about $40 million.  (SAC,

22   ¶ 163; Driscoll Decl., ¶ 15.)  Ms. Kuehbeck relies on Employee D for similar information.

23   (SAC, ¶ 166.)  Although the Court accepts that Employees C and D would have this knowledge

24   (*see* Driscoll Decl., ¶¶ 15, 25), these facts do not demonstrate that the Defendants shared Mr.

25   Tafazzoli's view of the situation.

26        Ms. Kuehbeck also states that Genesis' Vice President of Human Resources told

27   Employee D to destroy all of Mr. Mangan's email messages, as well as messages for Mr. Fisher,

28   Mr. Frisk, Jeff Diamond, a member of Genesis' board, and Alex Lushtak, Genesis' Chairman.

United States District Court

For the Northern District of California

1   (SAC, ¶ 89; Driscoll Decl., ¶ 22.)  Employee D is identified as a manager of information

2   technology functions and, thus, would be in a position to know this information.  The fact that

3   Employee D was advised to destroy these emails is troubling.  However, Ms. Kuehbeck offers

4   no facts to suggest the named individual defendants initiated this order or that the directive was

5   not in compliance with Genesis' standard procedures when an employee leaves the company.

6   More importantly, however, Employee D does not provide any facts about the content of these

7   emails when, presumably, he would have been in a position to know that information.   Thus, on

8   balance, the Court finds this allegation does not create a strong inference of scienter.

9          Ms. Kuehbeck also relies on motive and opportunity allegations, claiming that

10  Defendants were motivated to commit this fraud to maintain a higher stock price, which would

11  facilitate ongoing merger negotiations with Pixelworks and also to enhance their personal stock

12  sales.  (*Compare* FAC ¶¶ 83-86 *with* SAC ¶¶ 93, 95-101.)  Although Ms. Kuehbeck adds

13  additional details about the proposed Pixelworks merger, the Ninth Circuit has clarified that

14  under the PSLRA's pleading standards, a plaintiff can no longer aver intent based on merely

15  alleging motive and opportunity.  *See In re Silicon Graphics*, 183 F.3d at 978-980; March 29

16  Order at 12-13 (citing same).

17         Finally, in order to support her scienter allegations, Ms. Kuehbeck relies on the fact that

18  the individual defendants sold their Genesis stock.  Although unusual or suspicious stock sales

19  may constitute circumstantial evidence of scienter, a court must also consider the timing of the

20  sales and prior trading history.  *See In re Silicon Graphics*, 183 F.3d at 985-86.  Ms. Kuehbeck's

21  allegations about the stock sales still are not sufficiently particularized to allege that these sales

22  were unusual or suspicious.  Indeed, the only changes to these allegations are the addition of

23  conclusory statements that the sales were out of character for the individual defendants, who had

24  "few if any sales of Genesis common stock in prior periods."  (*Compare* FAC, ¶¶ 89-99 *with*

25  SAC, ¶¶ 120-29.)[15]

26

27         [15]     Ms. Kuehbeck alleges that Mr. Tafazzoli and other Genesis employees and
    officers sold stock prior to the Class Period and advised certain source witnesses to do the
28  same.  The Court finds these allegations irrelevant to the question of whether the individual
    defendants acted with the requisite state of mind.  *See, e.g., In re Splash Tech Holdings Sec.*

The Court has considered the facts discussed above in their totality and concludes those facts do not support a finding that Defendants intentionally or with deliberate recklessness made false statements or omitted material information in the April 29 press release and conference call.  Similarly, these facts do not support a strong inference that Defendants' statements were actually false when made with respect to the revenue projections.

Accordingly, Ms. Kuehbeck has not met her burden to plead scienter with particularity.

### D.       Section 20(a) Liability.

Section 20(a) of the Securities and Exchange Act provides derivative liability for those who control others found to be primarily liable under the Act.  *In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002).  Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same.  *Id.*  Because Ms. Kuehbeck has failed to plead adequately the underlying 10b-5 violation, the section 20(a) claim must be dismissed against the individual defendants as well.  *See, e.g., Employer-Teamster Joint Counsel Pension Trust v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

### E.       Leave to Amend.

Motions to dismiss are viewed with disfavor and are rarely granted.  A complaint will not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief.  *Conley*, 355 U.S. at 45-46.  Under the PSLRA, however, "the court shall, on motion of any defendant, dismiss the complaint if the requirements of paragraph (1) and (2) are not met."  15 U.S.C. § 78i-4(b)(3)(A).  The Court is cognizant of the fact that leave to amend "'shall be freely given when justice so requires'" and that this policy is liberally applied.  *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citing *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).  The standards in the PSLRA are high and,

*Litig.*, 160 F. Supp. 2d 1059, 1082 n.22 (N.D. Cal. 2001) (declining to consider allegations regarding insiders not named as defendants in evaluating scienter).

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   accordingly, "[a]dherence to these principles is especially important in the context of the

2   PSLRA." *Id.*

3        Ms. Kuehbeck asserts that the allegations in the SAC are "the tip of the iceberg of what

4   may be learned in discovery." (*See* Plaintiff's Opp. at 15 n.21.)  However, it is well established

5   that it "is not sufficient for a plaintiff's pleadings to set forth a belief that" discovery will

6   uncover facts to validate her claim. *In re Silicon Graphics*, 183 F.3d at 985.  The SAC is the

7   third iteration of Ms. Kuehbeck's complaint.  Therefore, she has had ample opportunity to set

8   forth the facts underlying her claims with the requisite particularity.  Further, this Court's

9   practice is to issue tentative rulings with questions for counsel prior to oral argument.  One of

10  the questions posed to Ms. Kuehbeck in advance of the hearing was what additional facts she

11  could proffer to support her claims.  Despite receiving this advance notice, Ms. Kuehbeck did

12  not bring any additional facts to the Court's attention at the hearing.  The Court therefore

13  concludes that giving Ms. Kuehbeck a further attempt at amending her complaint would be an

14  exercise in futility. *See Forman v. Davis*, 371 U.S. 178, 182 (1962).

15                                      **CONCLUSION**

16       In light of the heightened pleading standards of the PSLRA and the requirements of

17  Federal Rule of Civil Procedure 12(b)(6), the Court GRANTS Defendants' motion to dismiss

18  without leave to amend, and dismisses this case with prejudice.

19       **IT IS SO ORDERED.**

20

21  Dated:  July 27, 2005

22                                    JEFFREY S. WHITE
                                  UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28